May it please the Court. Rebecca Heckman, UCLA Law Appellate Advocacy Clinic. Rebecca Heckman, UCLA Law Appellate Advocacy Clinic. Pro Bono Counsel for Appellant Otis Thomas. Arguing with me today is my colleague John Monson from O'Melveny & Myers. We'll be splitting the argument time today. I'll begin by addressing the Eighth Amendment deliberate indifference issue. Mr. Monson will continue with this issue. He's also prepared to answer any other questions that the Court may have. We'd also like to reserve one minute for rebuttal. This appeal arises from the District Court's grant of summary judgment to appellee prison officials on Mr. Thomas' Eighth Amendment deprivation of exercise claim. For 14 continuous months, appellees confined Thomas in a maximum security cell without access to the outside world, with no out-of-cell exercise, without contact with other inmates or family, without opportunities to leave his cell to fulfill his work requirements. Let me ask you a question. Yes, ma'am. In your brief, you seem to stress the fact that Mr. Thomas went without exercise for 13 months. But shouldn't we view this case as a repeated failure to comply with prison policy and a repeated consequence of that? Shouldn't our decision in this case turn on whether it's objectively reasonable to condition out-of-cell exercises on signing a pledge form and not on how many times the exercise was denied in this case? Your Honor, two points. First, it's disputed. Mr. Thomas did commit in writing to nonviolence in an interview form. That was the stated purpose of the pledge form. He wouldn't sign the pledge form for very strongly held reasons. Notwithstanding his noncompliance, prison officials cannot continuously deprive him of a basic human necessity, notwithstanding his obstinacy, notwithstanding the validity of the prison policy issue. This Court said exactly that in Foster v. Reynolds. Other circuits have said that in Williams v. Griefinger, Cooper v. Sheriff Lubbock County. The issue is whether prison officials' response was disproportionate and unconstitutional, notwithstanding his failure to sign the pledge form. He repeatedly complained about his lack of exercise. Prison officials knew he was being deprived for 14 months. They knew this was a basic human necessity. There was an obligation for them to provide him access to some out-of-cell exercise, to provide some alternative to make sure that his basic human needs were being met. Prison officials did not do that in this case. That's the essence of deliberate indifference. All right. Well, let me ask you another question about whether our case law is in conflict. For example, do you think that the recent Foster case, which dealt with denying meals to an inmate who covered his cell window, conflicts with our older Rickman case, in which we held it was lawful to restrict an inmate's access to exercise if he refuses to submit to visual strip searches? How do you distinguish these cases? We don't think so, Your Honor. First of all, Rickman didn't mention the Eighth Amendment at all. There was one line about his access to exercise that said his constitutional rights were not violated. Foster, which explicitly deals with the Eighth Amendment, held that prison officials cannot repeatedly deprive inmates of a basic human need. In this case, it would not be objectively. We know from the cases since Spain, Tucson, Allen, that officials are under an obligation to provide inmates with access to exercise. We know from Lemaire and Hayward that the circumstances must be very unusual if they're going to be deprived of exercise and that the deprivation must be temporary. Foster adds to that that inmates can't be deprived of a basic human need. We don't think that there's a conflict in this case, particularly the fact that Rickman didn't deal explicitly with the Eighth Amendment. Thank you. That's responsive. Thank you. Are you saying they had no right to ask him to give this pledge? Absolutely not. The issue in this case is not whether or not the pledge requirement was valid or legitimate. We're not making that argument. The only issue is whether their response was disproportionate. In this case, a rational jury could find that their response was disproportionate given the substantial case law establishing inmates' right to exercise, establishing the importance to inmate health and safety, given the fact that he's complaining about his lack of exercise, given the fact that under their argument they could indefinitely deprive him of access to exercise as long as he failed to sign the pledge form, and also given the fact that he had committed in writing to nonviolence in another form. I see that my time is coming close. I'd like to turn the argument over to my colleague. Thank you, Your Honor. Again, this is John Monson representing the appellant. I'd like to just focus again on the procedural posture of this case. This is a summary judgment case, and the issue here, not whether the claim is meritorious, but whether there is a triable issue on the existence of deliberate indifference in this case. As this court held this last year in Condie City of Reno, the obvious nature of a deprivation can give rise to a triable issue, and in this case the precedent is clear that a long-term deprivation of exercise poses an obvious risk to an inmate's health and safety, both mental and physical. I think it's also important to pay attention to... Are you suggesting there's a question of the fact as to why they denied him out of cell? Was it sort of retribution or a stare-down as opposed to legitimate safety concerns? Is that what you're suggesting? Well, there is a question of fact on the record about the justification for putting him on the modified programming with no exercise. As we pointed out in our papers and as the prison records made clear, it was based solely on his decision not to sign the pledge form. Now, the government has argued in their papers and elsewhere that his disciplinary history and other factors contributed to that, and there's certainly a dispute on that issue. I think taking those facts in a light most favorable to Mr. Thomas, the issue, as my colleague said, is whether the response to his not signing the pledge form is disproportionate to the security reasons that they instituted the pledge form in the first place. I think it's also important to focus on what the standard is. What this court held in Spain and what Allen held in Allen v. Saki, this court again, and what has been cited repeatedly in district courts throughout this circuit for the last 20 years is that some form of outdoor exercise must be provided unless unusual circumstances renders that exercise impossible. Now, there's only been one case that they have cited, the opposition has cited, where this court found that it met that standard, and that was Lamer v. Mass, a case where the inmate repeatedly and savagely attacked inmates and staff and vowed to do so again if he was released for exercise. And even in that case, the court noted that there was evidence on the record that he had been provided adequate in-cell exercise. And along that same lines, other courts have followed, such as the Fourth Circuit and Mitchell v. Rice, saying that the lack of evidence on the record of other alternatives to exercise that could have addressed any valid security concerns via his failure to sign the pledge form makes it impossible to decide the case on summary judgment. Suppose there hadn't been the preliminary interviews where he signed some things and that all you had in this case was they came to see him and said, look, if you want to get off this condition, you sign this pledge. And he said, I won't. And they said, you won't sign the pledge, no privileges for you until you do sign the pledge. Would that also, in your view, have been improper? Well, I think that would be a weaker case, certainly, but I think in that circumstance where you have a 14... I would say that a 14-month long-term and continuous deprivation of exercise raises a tribal issue on deliberate indifference. If the conduct in question and the repercussions of that conduct cross over into a basic life necessity like exercise, this Court has recognized repeatedly that exercise is a basic life necessity. I think in that circumstance, not knowing the other facts of that case, it would cross over. But in our case, we do have an inmate who has already fulfilled the ostensible purpose of that form and in doing so addressed the concerns that are cited by the prison throughout the policy that gave rise to this pledge form in the first place, which was to get inmates to commit to program nonviolently. In that circumstance, and in view of the fact that there's no record evidence that they ever gave him any opportunity for solitary exercise or in-cell exercise, and again, exercise is almost a misnomer here. We're not talking about an inmate who wants to go out and just pump iron all day. We're talking about an inmate who's shackled on the rare occasions he leaves the cell and strip searched and doesn't even get an opportunity to walk outside. I see my time is up. Thank you. May it please the Court, Nguyen for the defendant's appellees. Your Honor, if I may, I would like to address Judge Nelson's question regarding whether there's a conflict between Rickman and Foster. In Foster, I think the Court didn't rule out the possibility of imposing a condition. The reason is a little louder. I'm sorry. Yes. Okay. In Foster, the Ninth Circuit didn't rule out the possibility of imposing a condition so long as that condition is reasonable. And necessary. And necessary. And in this case, the pledge, and I think the Court, Your Honor, should focus on the context as to how this pledge was introduced. In 2005, July 14, 2005, an inmate stabbed two officers, almost killing them. And in a memorandum to all Facility C inmates, Captain Ponder told all the inmates that Salinas Valley, particularly Facility C, had experienced, for instance, four separate instances of violence in the past, and then you have the attempted murder incident. And what Captain Ponder found, and the staff found, that inmates in Facility C had succumbed to peer pressure, had condoned violence, had accepted violence as a way of life. So rather than simply placing the prison on lockdown and then doing the investigation and then letting the inmates out and then wait for another incident and doing the same step over again, what they did was try to change the inmates' perception or acceptance of violence. What they wanted to do was change the culture of prison violence and how they viewed prison violence. Captain Ponder told them that violence is unacceptable, and then he laid out in detail as to what you can do to get all your privileges back, including outdoor exercise. And in that memorandum... I understand that, and you've explained that very well in your brief. What I don't understand is Mr. Thomas alleges that other prisoners were allowed exercise without signing the pledge form. So doesn't this raise a question of fact on summary judgment as to the reason why he was deprived if other prisoners were allowed exercise without signing the pledge form? Because the other prisoners didn't show a propensity for violence or probably didn't have a history of violence or indicated to prison officials somehow that they weren't a threat to the prison population. That they weren't what? They were not a threat to the general population. So you don't really have to sign the form if you somehow, in some other way, indicate you're not a threat. And in that case, why isn't the signature on the other questionnaire, the interview form, why doesn't that raise a question of fact? I really have trouble understanding what it is that you want him to say in the pledge form that he didn't say in the interview form. Well, the way the interviews were conducted, the officers would read the questions to the inmate, and then I guess the requirement is that it has to be at least five minutes, and then the officer would sign it, and then the inmate would sign it as well. But the reason why the pledge was also important was because it tells all of the inmates, for those who are released on the normal programming, that these inmates have signed the pledge, they have completed a two-step process, and that's why they're out there. And those who didn't complete the two-step process were still on modified programming. But what is it that they pledged in the pledge that they didn't agree to in signing this interview form? What did they pledge to do? Maybe we've got the wrong case about the pledge. What is it that the pledge does that the interview form doesn't? The pledge contains 12 questions. I don't think about a third to half of them contain about background information. There are two questions. There's background information, but what does a prisoner pledge to do? Well, I think, Your Honor, it's talking about questions six and eight in the pledge, which talks about are you willing to program without violence. Six and eight. Six and eight. That's the interview form. Yes, and then I'm going to compare that to the pledge and how the pledge contains more information or more requirements. It's more information that he gets, but what does he pledge to do? Oh, that he wants to participate in the program review process, that he will stipulate to do his own time, that he won't participate in gang violence, that if he does not follow the prison rules, that it may result in programming and housing changes, that during this program process that he will retain his work and privilege group, and that his participation in the program review process won't get him a credit-earning assignment, that his programs and privileges. What does that have to do with his exercise? You know, the interview form makes the commitments specifically, I think. Well, he's willing to commit to the program. He's without violence in the population, whatever. From all races, ethnics, or present gangs, isn't that what you want him to do, that he will pledge to participate without violence and commit to that type of program and do it without regard to race, ethnic, or past or present gang affiliation? Isn't that what you're concerned about? Yes, and that's what the interview form asks Mr. Thomas about. But once we got to the pledge, I think the second paragraph, first sentence states, by signing this document, you're telling staff that you would do the following things. And for some reason, Mr. Thomas refused to do that. Yeah, well, I can't imagine any reason. But, you know, there are people who don't like to sign pledges. But, you know, and he finally gave up. He finally broke them. But the question is, is it necessary to keep him from the yard? I guess necessary means to be assured you're going to have no violence in the yard. It was necessary because this was part of the mission, a new mission that Captain Ponder implemented during a tumultuous period of prison violence. It had some kind of psychological benefit to the inmates who made this pledge to be out there. And that those... Is the pledge basically just more symbolic and formal than what he signed before? Is that the theory that once he signs his pledge, he's in a position where he can't say, well, that's not what I really intended or something like that? Is that the notion behind the pledge? It's more than symbolic. It's just telling everyone, prison staff and all the other inmates, I am making this commitment. I am going along with the program review process, and I will help prison officials transition from modified programming to normal programming. But then I don't understand. In his supplemental excursive record, the second one, inmates Frazier, Dotson, and Brown at pages 67, 75, and 76 said, we didn't sign the pledge and we got to exercise it. Are you telling me that they had been individually examined, that they were not threats to the population, therefore they didn't have to sign the pledge? Mr. Thomas didn't provide any background information about those particular inmates, so we don't know what kind of propensity for violence or what kind of- You don't know? The prison didn't know when they exempted them? They didn't know why? Well, no, what I'm saying is that Mr. Thomas didn't provide information about these inmates as to why allegedly that they were released to- I know, but they said they were exempted. He could have given a reason, couldn't he, as to why they were exempted? Well- He's supposed to know why he exempted them? Well, Your Honor, that's Mr. Thomas' burden. I'm sorry, that doesn't seem to me. He showed they were exempted. If you had a reason to exempt them, how's he supposed to know what's in the mind of the head of the prison? The way that argument was addressed below was in the context of equal protection. And so when we're talking about exercise, he devoted about two pages to the exercise claim. And of those two pages, he talks about mostly the law. He laid out the law on the Eighth Amendment analysis. And then in one-or actually two sentences, he said that 13 months of denial or successfully complying to my cell equaled the Eighth Amendment violation. I also want to emphasize one point. I know I'm running short on time. Well, if you have something important to say, you should not feel constrained simply because somebody put a number on your time. I do want to emphasize that Mr. Thomas shouldn't get to pick and choose which part of the program review process he wants to comply with. Otherwise, he can simply challenge any other prison rule or regulation. For instance, if he doesn't want to comply – for instance, if he wanted to go to the library and let's say, for instance, I don't like search policy. I mean, you know, if- Somebody can challenge a policy and you don't deprive them of their constitutional rights. That was the problem in Foster v. Reynolds. The prisoner refused to follow the policy. And they said you can't punish them by depriving them of food. What makes Foster distinguishable is that the inmate had his back window covered and the prison officials didn't really offer an explanation as to why that created a security concern during feeding time. In this case, the pledge played an integral part in the new mission to change the culture of prison violence. And it meant something to the inmates if they signed it or didn't sign it. You have a lot more confidence in a prisoner signing a pledge that that's going to eliminate violence. The only sign is a piece of paper saying the same thing. But the issue is not whether it would be successful. It's just this is what prison officials believed at the time. They had to do something new. They changed course and tried this pledge. Do you have any information approximately what percentage of the prisoners did sign the pledge? The answer can't – I don't know, Your Honor. It's not in the record. The majority? But what I do know is, for instance, as of January 1, 2006, roughly about six months after the incident, 148 facility seat inmates signed the pledge. Thank you, Your Honor. Thank you. Thank you, Your Honor. Two minutes. Thank you, Your Honor. Just to make a few quick points. I'd like to point out one decision that hasn't been mentioned today was the Richardson v. Runnels case, which we pointed out in our 28J letter. In that case, I think this Court made clear that these exercise claims are inherently context-specific. And for the same reasons that we've been discussing here today, what's the purpose of the pledge form versus the interview form, and what's the link to the exercise, and what conditions were the inmates under? These are all facts that a jury weighs and determines whether there has been deliberate indifference. That's the whole purpose of the jury system. I think in this instance, where there is an inmate who is committed to nonviolence, which the government admits was the principal purpose of the pledge form and of this policy that Ponder created, a jury is certainly entitled and a rational jury could conclude that a 14-month continuous deprivation of all out-of-cell exercise raises a triable. It is deliberate indifference to his mental and physical health. Also, in regards to Judge Nelson's question about the other inmates, the government argued that, well, it was probably because they have violent histories. I mean, there's nothing on the record about that. And clearly on a summary judgment motion, the moving party at least has the initial burden to prove the absence of a genuine issue of fact, and we are talking about a pro se litigant here. And we cited multiple cases in our papers, and the court is well aware of the deference that you provide to pro se litigants. Thank you. Thank you, counsel. Case just argued will be submitted. Court will take recess.
judges: Friedman, Nelson D. W., Reinhardt